UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| YARHONDA FREEMAN, | ) |
| Plaintiff | ) ) ) |
| v. | ) ) ) |
| PROFESSIONAL SECURITY CONSULTANTS, INC. | ) ) ) ) |
| Defendant | ) ) |

## COMPLAINT AND JURY DEMAND

### Parties

1. Plaintiff Yarhonda Freeman ("Ms. Freeman" or "Plaintiff") is a female resident of the State of Connecticut, residing at 93 Judith Terrace, Apartment 2A, New Haven, CT 06513.

2. Defendant Professional Security Consultants, Inc. (the "Defendant" or the "Company") is a for-profit corporation that, upon information and belief, is incorporated in the State of California and its principal office is located at 11454 San Vincente Boulevard, 2nd Floor, Los Angeles, CA 90049.  During all relevant times, the Company did business within, and employed individuals in, the State of Connecticut, including Ms. Freeman.

### Jurisdiction and Venue

3. The court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §1331 because Plaintiff has brought claims pursuant to Title VII, 42 U.S.C. § 2000e-2, et al. The court may exercise supplemental jurisdiction over the Plaintiff's state law claims. 28 U.S.C. §1367.

4. This court has personal jurisdiction over the Company because the Company has engaged in and transacted business in the State of Connecticut, including by owning, managing and/or operating a facility located at 1201 Boston Post Road, Milford, CT 06611 and by employing the Plaintiff in Connecticut, and the Plaintiff's causes of action stem largely from business transactions and employment actions by Defendant within the State of Connecticut. Indeed, the Plaintiff was employed by the Defendants in the State of Connecticut, was managed and reprimanded by the Defendant in the State of Connecticut and was terminated by the Defendant in the State of Connecticut. Furthermore, the Company has registered with the State of Connecticut as a foreign corporation doing business in the State of Connecticut.

## Statement of Facts

5. On or around August 2, 2019, Ms. Freeman began employment by the Defendant as a security officer in Milford, CT.

6. Ms. Freeman is a Lesbian woman.

7. Throughout her employment, Ms. Freeman primarily worked out of a Company facility located at 1201 Boston Post Road, Milford, CT 06611.

8. At all relevant times, the Defendant employed 15 or more employees for 20 or more calendar weeks in the preceding 12 months.

9. At all relevant times, Ms. Freeman was a qualified employee, and her job performance was satisfactory.

10. Ms. Freeman was one of the only women working on the overnight shift for the Company in her location.

11. Soon after Ms. Freeman was hired by the Company, she began to experience sexually harassing behavior from her co-workers and supervisors.

12. For example, even though Ms. Freeman made it clear that it made her uncomfortable, Ms. Freeman's male supervisors and co-workers insisted on boasting to Ms. Freeman in a chauvinistic manner about women who had previously been employed by the Company and who they claimed to have slept with.

13. This sexually harassing behavior was also perpetrated by Ms. Freeman's direct supervisor Daniel Perkins ("Perkins").

14. Perkins is a man and is heterosexual in terms of his sexual orientation.

15. The frequent explicit boasting by male employees about sexual conquests of female employees, and comments objectifying women and treating them as sexual objects created a severe and pervasive sexually harassing hostile work environment for Ms. Freeman.

16. Feeling extremely uncomfortable, Ms. Freeman raised protected concerns to her manager Carl Zink ("Zink") that the sexually harassing comments from him and her other male co-workers about women that they had slept with made her uncomfortable. Indeed, these sexually harassing comments were made on a daily basis.

17. Notably, the Company employed far more men than women and Ms. Freeman was substantially outnumbered by her male co-workers.

18. Zink at first promised that he would do something to make Ms. Freeman more comfortable. However, upon information and belief, Perkins took no meaningful action to help Ms. Freeman. Indeed, the discriminatory and harassing remarks from Perkins himself, as well as from her male co-workers, continued in an escalated manner.

19. As such, it was clear that Zink did nothing meaningful to stop the sexually harassing conduct that was creating a hostile work environment and making Ms. Freeman so uncomfortable.

20. In or around early September 2019, Ms. Freeman was alone on the night shift with male security officer Perkins.

21. While Perkins and Ms. Freeman were in a patrol car, Perkins stated to Ms. Freeman that he hoped he would find people having sex.

22. When Ms. Freeman questioned this openly suggestive comment, Perkins stated that "well, if I'm not having sex, then nobody is." While making this comment, Perkins was staring at Ms. Freeman in a lascivious and aggressive manner, making clear that he was emphasizing Ms. Freeman's powerlessness as a woman alone among men.

23. This comment was extremely threatening, and based on Perkins' words, expression, and physical mannerisms, it was clear that he was implying that he could do what he wanted with her in a sexual manner.

24. Perkins was also substantially larger than Ms. Freeman, and as such, Ms. Freeman felt extremely intimidated and physically threatened, as it seemed Perkins wanted to physically and/or sexually assault Ms. Freeman.

25. As soon as Ms. Freeman was able, she got away from Perkins to avoid his threat of physical and sexual violence.

26. The next day, Ms. Freeman raised protected concerns to her supervisor Zink about Perkins' harassment and implied threat of sexual assault.

27. Zink stated that he would talk to Perkins, but Perkins continued his sexually harassing behavior and it again appeared that Zink did not want to do anything to stop the sexual harassment perpetrated by himself, Perkins or Ms. Freeman's other male co-workers.

28. In or around late September 2019, because she was experiencing increasingly pervasive sexual harassment from her male co-workers, Ms. Freeman again raised protected

concerns to Zink that she was extremely uncomfortable because of the sexual advances of her male co-workers.

29. Ms. Freeman also disclosed that she was a lesbian and not interested in her male co-worker's sexual advances.

30. Zink did not make an attempt to address Ms. Freeman's protected concerns.

31. Instead, later that morning, Perkins shockingly said, "I'm going to wait my turn, I don't care if you're gay, I would still fuck you."

32. Ms. Freeman felt demeaned and powerless, as Perkins sexually harassing comments made clear that Perkins would not address the sexual harassment that she had experienced and in fact, that he felt entitled to utilize his higher position within the Company hierarchy to further harass her based on her gender and sexual orientation. Indeed, Ms. Freeman was shocked and disgusted by Perkins' comments towards her gender and sexual orientation.

33. Ms. Freeman, in desperation, raised protected concerns to Perkins' supervisor Vincent Persiscio ("Persiscio") that Perkins and her co-workers were sexually harassing her, and nothing was being done to address it when she raised protected concerns.

34. Persiscio is a man and is heterosexual in terms of his sexual orientation.

35. Persiscio said that he would try to address Ms. Freeman's protected concerns. However, Persiscio did not take any meaningful action. Indeed, Ms. Freeman continued to experience sexual harassment from Perkins and her co-workers, and upon information and belief, nothing was done to address her protected concerns.

36. However, it seemed that Persiscio had made Perkins aware of Ms. Freeman's protected concerns, and Perkins began to treat Ms. Freeman in an increasingly negative and retaliatory manner.

37. For example, Perkins reprimanded Ms. Freeman for not doing her hourly check-in (even though she had) and even though her male co-workers were not reprimanded for this alleged behavior.

38. Perkins' behavior was clearly in retaliation for Ms. Freeman refusing his sexual advances and raising protected concerns about the unwanted sexual advances made by Ms. Freeman's other male co-workers and Perkins himself.

39. Shortly after this retaliatory incident, in or around early October 2019, when Ms. Freeman was leaving work, Ms. Freeman overheard Perkins talking with one of her male co-workers.

40. Perkins was talking in a lewd manner about a female security officer previously employed by the Company who he claimed to have had sex with.

41. Ms. Freeman's male co-worker pointed at Ms. Freeman and asked Perkins, "what about her?"

42. Perkins responded, shockingly saying, "I think she is gay, but I would still fuck her."

43. Perkins' comment was clearly with the earshot of Ms. Freeman and was clearly intended as a sexually harassing comment. Indeed, it clearly was discriminatory against her gender and sexual orientation.

44. On or around October 18, 2019, Ms. Freeman, frustrated by the inaction by management related to her protected concerns about sexual harassment and discrimination, raised protected concerns via the Company hotline related to sexual harassment and retaliation.

45. Ms. Freeman, through the Company concerns hotline, raised protected concerns to Dennis Kranz ("Kranz") that Perkins and her male co-workers, including Zink, were sexually

harassing her and nothing was being done about it, even after she raised protected concerns to Persiscio.

46. Upon information and belief, the Company hotline conveyed Ms. Freeman's sexual harassment and discrimination concerns to Company management.

47. After raising protected concerns to Kranz, a male area supervisor Mohammed Shah ("Shah") came down to the Ms. Freeman's location and called Ms. Freeman and Perkins into a meeting.

48. Shah is a man and is heterosexual in terms of his sexual orientation.

49. Shah would not let Ms. Freeman speak during this meeting and appeared uninterested in listening to, or meaningfully addressing, Ms. Freeman's protected concerns.

50. At the end of the meeting, Shah declared that he would not do anything to address the sexual harassment towards Ms. Freeman and told Ms. Freeman that she should not have raised protected concerns to the Company hotline.

51. Ms. Freeman protested and raised further protected concerns that Shah was acting improperly by essentially allowing Perkins and her male co-workers' sexual harassment to continue.

52. Shah continued to refuse to address Ms. Freeman's protected concerns, growing angry and leaving the meeting.

53. Due to Shah's refusal to address Ms. Freeman's protected concerns about the sexual harassment she had experienced from Perkins and her male co-workers, the sexual harassment towards Ms. Freeman continued unfettered. Indeed, Perkins was clearly angry that Ms. Freeman had tried to go over his head to raise sexual harassment concerns and retaliated against her.

54. After this incident, Ms. Freeman again raised protected concerns to Kranz that the sexual harassment from Perkins and her male co-workers was still occurring and that no one at the Company was willing to do anything to stop it, even after she raised protected harassment concerns.

55. Kranz said that he would look into Ms. Freeman's protected concerns again, but nothing meaningful was done.

56. On or around November 7, 2019, Ms. Freeman made a request to head security officer Vincent Riccio ("Riccio"), who occupied a supervisor position above her in the Company hierarchy, to take one day off on November 16, 2019 for the funeral of her cousin. Ms. Freeman had sufficient accrued time off to cover this requested day off.

57. Riccio is a man and is heterosexual in terms of his sexual orientation.

58. In light of the retaliation Perkins had already subjected her to, Ms. Freeman was afraid that if she asked Perkins for time off, he would not grant it in retaliation for her refusing his sexual advances and raising sexual harassment concerns.

59. However, Riccio would not grant Ms. Freeman's request, even though Ms. Freeman had asked for time off more than 9 days in advance.

60. Riccio and Perkins would regularly grant time off to Ms. Freeman's male co-workers even when they requested this time off only 24 hours or less in advance.

61. This refusal by Riccio to grant Ms. Freeman her requested day off was clearly in retaliation for raising protected concerns about sexual harassment by Perkins and her other male co-workers.

62. As such, on November 16, 2019, Ms. Freeman came into work as usual because of the denial of her request. Ms. Freeman worked her normal full shift on November 16, 2019.

63. Three days later, on or around November 19, 2019, Riccio called Ms. Freeman and told her that she was terminated for supposedly having been a no-call, no-show on November 16, 2019.

64. Ms. Freeman protested, stating that she had been at work on November 16, 2019 because of Riccio's discriminatory refusal of her request for time off.

65. However, Riccio refused to rescind her termination, even though Ms. Freeman had punched in and out of work on November 16, 2019 and had worked her normal shift that day.

66. Ms. Freeman was therefore involuntarily terminated from the Company on November 19, 2019.

67. Ms. Freeman's harassers, including Perkins, Zink and her other male co-workers are still employed by the Company.

68. Ms. Freeman was involuntarily fired and did not voluntarily resign from the Company.

69. The Company presented Ms. Freeman with a resignation notice and pressured her to sign it, but she refused. Later, after Ms. Freeman filed a charge of discrimination with the Connecticut Commission on Human Rights and Opportunities, the Company unexpectedly produced a fraudulent document that it claimed was a signed resignation notice. The document is and was a fraud created after the fact. Indeed, the signature that is on this alleged resignation is forged, as it is in no way similar to Ms. Freeman's signature. Indeed, Ms. Freeman did not resign and never signed any resignation notice. Indeed, the Company fired Ms. Freeman.

70. Ms. Freeman was terminated in retaliation for raising protected concerns about the sexual advances and harassment of her co-workers, as she was terminated only one month

after raising protected concerns to the Company hotline about the sexual harassment that she had endured from Perkins, Zink and her other male co-workers.

71. The Company did not adequately investigate Ms. Freeman's protected concerns, as Kranz closed out Ms. Freeman's complaint without a statement from Ms. Freeman, and after only hearing the version of events presented by her harasser Perkins.

72. Kranz then ignored Ms. Freeman when she tried to provide further detail regarding the blatant sexual harassment from her supervisors and co-workers.

73. On or around June 17, 2020, Ms. Freeman timely filed a Charge of Discrimination with the Connecticut Commission on Human Rights and Opportunities ("CHRO"), which was cross-filed with the United States Equal Employment Opportunity Commission ("EEOC").

74. On or around December 16, 2020, Ms. Freeman informed the CHRO of her intent to pursue her claims in court and accordingly requested that the CHRO release jurisdiction.

75. On or around INSERT DATE, the CHRO issued Ms. Freeman a release of jurisdiction to allow her to pursue her claims in court.

76. On or around INSERT DATE, the EEOC provided Ms. Freeman with a Notice of a Right to Sue letter.

77. This lawsuit is timely filed.

## COUNT I

**(Sex and Sexual Orientation Discrimination and Sexual Harassment, in Violation of Conn. Gen. Stat. § 46(a)-60 and §46(a)-81)**

**Ms. Freeman v. Defendant**

78. The Plaintiff incorporates all paragraphs above and below as if set forth fully herein.

79. The Company is an employer under the definition of Connecticut General Statute §46(a)-60) and §46(a)-81 because the Company employed 3 or more persons.

80. Ms. Freeman is a woman.

81. Ms. Freeman is also homosexual in terms of her sexual orientation.

82. The Company, including, but not limited to, its agents, harassed and discriminated against Ms. Freeman with respect to her compensation, terms, conditions, or privileges of employment, because of Ms. Freeman's sex and sexual orientation.

83. More specifically, by way of illustration, the Company subjected Ms. Freeman to a pattern of sexual harassment by multiple individuals employed by the Company, including individuals in supervisory positions, who made repeated sexual advances on Ms. Freeman despite her staunch disapproval and vocal disinclination to pursue any such relationship, including noting that she was a lesbian female uninterested in these sexual advances.

84. Indeed, Perkins and other Company employees were clearly biased against Ms. Freeman because she was a lesbian woman who, due to her sexual orientation (as well as her common sense and good taste) was not inclined to engage in sexual relations with male Company employees and refused to submit to hetero-normative sexual harassment by male Company employees who viewed women as occupying a natural position as sexual objects to be conquered by men.

85. Ms. Freeman was further subjected to adverse actions, including, but not limited to, a harassing and hostile work environment related to her sex and sexual orientation, and the termination of her employment, due to a bias by the Company and its management, who

harassed and blamed Ms. Freeman, as a lesbian woman, for being the victim of sexual harassment, as well as for being a victim who refused to submit to or reciprocate sexually harassing conduct by heterosexual male employees.

86. Ms. Freeman was further subjected to adverse actions for discriminatory reasons related to her sex and sexual orientation, including, but not limited to, a harassing and hostile work environment, discriminatory denial of requested days off, and the termination of her employment, due to a bias by the Company against Ms. Freeman as a lesbian woman who experienced sexual harassment and refused to submit to such behavior.

87. The Company committed these discriminatory acts in a willful, wanton and/or malicious manner.

88. As a direct and proximate result of Defendants' violation of Conn. Gen. Stat. §§46(a)-60) and §46(a)-81, Ms. Freeman has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, loss of earning capacity, other monetary harms, pain and suffering, loss of enjoyment of life, and emotional damages.

89. Mr. Freeman seeks all damages to which he is entitled, including, but not limited to lost compensation and benefits (including, but not limited to, back pay and front pay), other monetary damages, emotional distress damages, other compensatory damages (including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses), punitive damages, injury to reputation, diminished earning capacity, interest, attorney's fees, and costs.

**COUNT II**

**(Sex and Sexual Orientation Discrimination and Sexual Harassment in Violation of Title VII, 42 U.S.C. §§ 2000e, *et seq.*)**

**Ms. Freeman v. Defendant**

90. Plaintiff incorporates all paragraphs above and below as if set forth fully herein.

91. During all relevant periods, the Company was an employer under Title VII, 42 U.S.C. §§ 2000e, et. seq. (hereinafter, "Title VII") because it was a person engaged in an industry affecting commerce and had fifteen or more employees for each working day in each of twenty or more calendar weeks during the relevant calendar years.

92. Ms. Freeman is a woman.

93. Ms. Freeman is also homosexual in terms of her sexual orientation.

94. The Company, by and through its agents and affiliates, harassed and discriminated against Ms. Freeman with respect to her compensation, terms, conditions, or privileges of employment, because of Ms. Freeman's sex, sexual orientation and/or because she did not submit to, or reciprocate, sexual harassment perpetrated by the Company and its employees.

95. More specifically, by way of illustration, the Company subjected Ms. Freeman to a pattern of sexual harassment by multiple individuals employed by the Company, including individuals in supervisory positions, who made repeated sexual advances on Ms. Freeman despite her staunch disapproval and vocal disinclination to pursue any such relationship, including making harassing comments about her (and displaying bias against her) because she was a lesbian female uninterested in these sexual advances.

96. Indeed, Perkins and other Company employees were clearly biased against Ms. Freeman because she was a lesbian woman who, due to her sexual orientation (as well as her common sense and good taste) was not inclined to engage in sexual relations with male

Company employees and refused to submit to hetero-normative sexual harassment by male Company employees who viewed women as occupying a natural position as sexual objects to be conquered by men.

97. Ms. Freeman was further subjected to adverse actions, including, but not limited to, a harassing and hostile work environment related to her sex and sexual orientation, and the termination of her employment, due to a bias by the Company and its male heterosexual management, who harassed and blamed Ms. Freeman, as a lesbian woman, for being the victim of sexual harassment, as well as for being a victim who refused to submit to or reciprocate sexually harassing conduct by heterosexual male employees.

98. Ms. Freeman was further subjected to adverse actions for discriminatory reasons related to her sex and sexual orientation, including, but not limited to, a harassing and hostile work environment, discriminatory denial of requested days off, and the termination of her employment, due to a bias by the Company and its management against Ms. Freeman as a lesbian woman who experienced sexual harassment and refused to submit to such behavior.

99. The Company acted with malice and/or with reckless indifference to the federally protected rights of Ms. Freeman.

100. As a direct and proximate result of Defendants' violation of Title VII, Ms. Freeman has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, loss of earning capacity, other monetary harms, pain and suffering, loss of enjoyment of life, and emotional damages.

101. Mr. Freeman seeks all damages to which she is entitled, including, but not limited to lost compensation and benefits (including, but not limited to, back pay and front pay), other monetary damages, emotional distress damages, other compensatory damages (including, but not

limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses), punitive damages, injury to reputation, diminished earning capacity, interest, attorney's fees, and costs.

## COUNT III

### (Retaliation in Violation of Conn. Gen. Stat. § 46(a)-60 and §46(a)-81)
### Ms. Freeman v. Defendant

102. Plaintiff incorporates all paragraphs above and below as if set forth fully herein.

103. Ms. Freeman in engaged in protected activity under Conn. Gen. Stat. § 46a-60 and § 46a-81, including, but not limited to, by opposing, and expressing protected concerns, and/or engaging in other protected activity, related to the harassing and discriminatory actions taken by the Defendant and its employees due to Ms. Freeman's sex and/or sexual orientation.

104. The manner in which Ms. Freeman reported such protected concerns complied with the Company's policies for reporting harassment and discrimination concerns.

105. The Defendant unlawfully coerced, intimidated, threatened and/or interfered with Ms. Freeman's exercising of or enjoyment of right granted by Conn. Gen. Stat. § 46a-60 and § 46a-81.

106. More specifically, the Defendant subjected Ms. Freeman to adverse actions, including, but not limited to, a harassing and hostile work environment, the denial of requested days off, and the termination of Ms. Freeman's employment because Ms. Freeman engaged in protected activity opposing harassment and discrimination related to her sex and sexual orientation.

107. The Company committed its retaliatory acts in a willful, wanton, and/or malicious manner.

108. As a direct and proximate result of the Defendant's violations of Conn. Gen. Stat. § 46-60, the Plaintiff has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, reduced earning capacity, other monetary harms, pain and suffering, loss of enjoyment of life, and emotional damages.

109. Ms. Freeman seeks all damages to which she is entitled, including, but not limited to lost compensation and benefits (including, but not limited to, back pay and front pay), other monetary damages, emotional distress damages, other compensatory damages (including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses), punitive damages, injury to reputation, diminished earning capacity, interest, attorney's fees, and costs.

## COUNT IV

### (Retaliation in Violation of Title VII, 42 U.S.C. §§ 2000e, *et seq.* )

### Ms. Freeman v. Defendant

110. Plaintiff incorporates all paragraphs above and below as if set forth fully herein.

111. During all relevant periods, the Company was an employer under Title VII, 42 U.S.C. §§ 2000e, et. seq. (hereinafter, "Title VII") because it was a person engaged in an industry affecting commerce and had fifteen or more employees for each working day in each of twenty or more calendar weeks during the relevant calendar years.

112. The Company, by and through its agents and affiliates, harassed and discriminated against Ms. Freeman with respect to her compensation, terms, conditions, or

privileges of employment, because of Ms. Freeman's sex, sexual orientation and/or because she did not submit to sexual harassment perpetrated by the Company.

113. Ms. Freeman engaged in protected activity under Title VII, including, but not limited to, by opposing and expressing protected concerns and/or engaging in other protected activity regarding the harassing and discriminatory actions improperly taken by the Defendant and its employees and agents, based on Ms. Freeman's sex, sexual orientation, sexual harassment, and/or the creation of a hostile work environment through illegal harassment and discrimination.

114. More specifically, the Company subjected Ms. Freeman to adverse actions, including, but not limited to, a hostile and harassing work environment, the denial of requested days off, and the termination of Ms. Freeman's employment because Ms. Freeman engaged in protected activity opposing sexual harassment and discrimination related to her sex and sexual orientation.

115. The Company acted with malice and/or with reckless indifference to the federally protected rights of Ms. Freeman.

116. As a direct and proximate result of Defendants' violation of Title VII, Ms. Freeman has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, loss of earning capacity, other monetary harms, pain and suffering, loss of enjoyment of life, and emotional damages.

117. Ms. Freeman seeks all damages to which she is entitled, including, but not limited to lost compensation and benefits (including, but not limited to, back pay and front pay), other monetary damages, emotional distress damages, other compensatory damages (including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish,

loss of enjoyment of life, and other nonpecuniary losses), punitive damages, injury to reputation, diminished earning capacity, interest, attorney's fees, and costs.

WHEREFORE, the Plaintiff, Yarhonda Freeman, respectfully requests that this honorable court:

- A. Schedule this matter for trial by jury;
- B. Find the Defendants liable on all counts;
- C. Award the Plaintiff her lost compensation and benefits (including, but not limited to, back pay and front pay);
- D. Award the Plaintiff other monetary damages, including damages for her diminished earning capacity and injury to reputation;
- E. Award the Plaintiff damages for his emotional pain, mental anguish, loss of enjoyment of life, suffering, and other emotional distress damages;
- F. Award the Plaintiff compensatory damages, including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses;
- G. Award the Plaintiff punitive damages;
- H. Award the Plaintiff her reasonable attorney's fees;
- I. Award the Plaintiff interest and costs;
- J. Award the Plaintiff all other damages to which she is entitled; and
- K. Grant such further relief as is just and equitable.

                                            Respectfully Submitted,

                                            YARHONDA FREEMAN

                                            By her attorneys,

                                            THE LAW OFFICES OF WYATT & ASSOCIATES P.L.L.C

Date: April 26, 2021                        By:   /s/ Trevor R. Brice_____

                                            Benjamin J. Wyatt, ct29994
                                            BWyatt@Wyattlegalservices.com

                                            Michael Varraso, ct30777
                                            MVarraso@wyattlegalservices.com

                                            Trevor R. Brice, ct30951
                                            Trevor@Wyattlegalservices.com

                                            The Law Offices of Wyatt & Associates, P.L.L.C.
                                            17 Elm Street, Suite C211
                                            Keene, NH 03431
                                            Telephone: (603) 357-1112
                                            Facsimile: (603) 685-2868